**United States District Court**
For the Northern District of California

**\*E-Filed 9/30/11\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

MALCOLM L. LANDRY,                                  No. C 10-04707 RS

          Plaintiff,

    v.                                                      **ORDER DENYING CROSS MOTIONS
FOR SUMMARY JUDGMENT**

MIKE BERRY,

          Defendant.

_____/

## I.  INTRODUCTION

Plaintiff Malcolm Landry challenges the constitutionality of his involuntary commitment to a county mental hospital by defendant Mike Berry, a California Highway Patrol (CHP) officer. After several motorists called 911 to report that Landry was driving erratically, Berry responded to a "be on the lookout" (BOL) broadcast from CHP dispatch.  After stopping Landry in Humboldt County in the town of Orick, California, Berry determined that Landry was suffering from a mental disorder that rendered him a danger to himself or to others.  Berry ultimately left Landry at the county mental health hospital pursuant to California Welfare and Institutions Code section 5150. Based on the involuntary hold, Berry brings two claims under 42 U.S.C. § 1983 for: (1) unlawful seizure in violation of the Fourth Amendment; and (2) civil commitment without due process in

United States District Court

For the Northern District of California

violation of the Fourteenth Amendment.  The parties bring cross-motions for summary judgment on the question of probable cause for the seizure.  Berry alternatively contends that, even if no probable cause supported his actions, he is nonetheless entitled to qualified immunity as any mistake was reasonable under the circumstances.  Based on the parties' briefing and oral argument, and for the reasons stated below, the motions for summary judgment by Landry and by Berry are each denied.[1]

## II.  BACKGROUND

Landry is a sixty-nine year old resident of Sparks, Nevada.  He suffers from Chronic Obstructive Pulmonary Disease (COP), which requires that he breathe oxygen through a nasal cannula attached to a tank.  On the evening of June 2, 2010, Landry left Sparks intending to drive to Manzanita, Oregon to visit a friend for a week or two.  His planned route involved taking Highway 101 to Cemetery Road at that destination.

Landry, driving a blue Chevrolet Lumina, began his trip overnight and arrived in San Francisco on the morning of June 3, 2010.  After taking a nap on the side of the road, he continued driving along Highway 101.  At approximately 2:40 p.m., outside of Laytonville, California, Landry ran over an obstruction in the road.  It caused him to swerve, hit a boulder, and dent his right front fender.  As a result of this incident, his car suffered a flat tire.  Landry flagged down a motorist who contacted the CHP.  The officers arranged to have a repairman come to the site and fix the flat.  The repair was completed by about 3:15 p.m.  Landry thanked the officers and continued driving.  He was not warned or cited for any offense as a result of this incident.

At 3:54 p.m., CHP dispatch received the first of several 911 phone calls regarding Landry's driving.  The caller, who identified Landry's vehicle by its license plate and described it as a blue Chevrolet sedan, reported that the car was "all over the roadway."  According to standard CHP procedure, the dispatcher entered this report in the tracking system as a suspected reckless driver.  The dispatcher broadcast a BOL radio call at 3:55 p.m. in order that officers in the area could attempt to locate Landry's vehicle and investigate.

---

[1]     In their respective motions for summary judgment, neither party separately addresses the due process claim.  Whether the parties presume this claim rises or falls with the alleged Fourth Amendment violation need not determined, as the motions for summary judgment are denied.

United States District Court

For the Northern District of California

Shortly thereafter, two CHP officers in separate vehicles made contact with Landry about twenty miles south of Garberville, California. One officer relayed a description to dispatch that Landry was "severely disabled" and "possibly off his medications." The officers subjected Landry to a field sobriety test and informed dispatch that he was not driving under the influence. According to Landry, the officers also searched his car without his permission. In the process, they opened his suitcase, left the tumbled contents in view, and emptied his wallet onto the front passenger seat.

The officers ultimately decided to transport Landry and his car to a motel in Garberville. They left Landry at the motel at 5:14 p.m. and told him to wait in the lobby until he could be picked up by family or friends. After waiting about forty-five minutes, Landry spoke to the motel manager who informed him that she could not require him to stay and that his keys were in the car parked at the motel. Landry resumed his trip and, as he was anxious to leave quickly, he did not attempt to straighten up the disarray in his vehicle caused by the officers' prior search.

At 6:42 p.m., another caller reported to CHP that a car was weaving in and out of lanes and that the driver was possibly sleepy. The party provided a vehicle description matching Landry's car, including that it had Nevada license plates. Dispatch broadcast another BOL, but no CHP officer located Landry at that time. As Landry continued driving north, two additional motorists called 911. At 8:18 p.m., a caller reported seeing a blue "Lincoln type" car near the town of Orick, California, driving only 5 to 10 miles per hour, without headings, and partially on the right-hand shoulder. Two minutes later, another driver called from the same location to report a vehicle repeatedly driving onto the shoulder of the road. That person called back shortly afterwards to provide the license plate number of Landry's vehicle. CHP again issued a BOL at 8:24 p.m. for officers to find Landry.

At this time, Berry had been on duty since early morning and was on his way home. As he was in the vicinity, he responded to the BOL and began looking for Landry's car. During the day, Barry had heard portions of the radio traffic with respect to the two prior BOLs involving the blue Chevrolet with an erratic driver. In responding to this third BOL, Berry had a phone conversation with the dispatcher and learned that Landry had been stopped earlier for erratic driving and taken to a motel. As Berry drove north, he saw muddy tire tracks on the road, which he attributed to a car

being driven into the ditch on the right hand side of the highway and then back onto it. Nearby, he saw a damaged guardrail. Based on the reports from dispatch of Landry's erratic driving, Berry concluded that Landry had hit the guardrail.

Berry located Landry in Orick at approximately 8:35 p.m. According to Berry, Landry was driving north in the southbound lane at around five to ten miles per hour. Berry observed Landry driving for a few seconds, identified the car, and then activated his lights to stop him. Barry contends that Landry at first attempted to drive around him, but stopped in response to Berry's command over the patrol car's loudspeaker. Landry disputes that he was driving on the highway at that time. Instead, he contends that he had turned his car around in a parking lot in order to roll down his window and speak to another driver through her window to ask for directions.

As Berry approached Landry's car, he purportedly noticed "fresh damage" on the right hand side, which he thought was consistent with Landry having hit the guardrail. Landry disputes that he collided with the guardrail or that there was evidence that his car had done so. As Berry approached the vehicle, Landry did not look at the officer, but instead kept looking forward. Other than the fact that he was breathing through a nasal cannula, Berry does not recall anything unusual about Landry's appearance. Berry, however, noticed old food and trash in the car, as well as the contents of Landry's wallet strewn on the passenger seat.

Berry spoke to Landry while he was sitting in his car for approximately three minutes. According to Berry, he had to ask Landry several times where he was going and if he was okay. Berry claims Landry seemed unable to answer questions normally or to understand the conversation. Landry would respond slowly or not answer, requiring the officer to repeat his questions. That said, Berry acknowledges that Landry was cooperative and, although quiet, his speech was understandable. Berry recalls that Landry stated he was going to "cemetery" or "Cemetery, California" and did not appear to be in any medical distress. Berry asked him if the oxygen tank was operating adequately to which Landry replied that it was. When Berry asked Landry about the reports of his erratic driving, including collision with the guardrail, Landry simply shrugged and stated that he did not recall any collision.

**United States District Court**
For the Northern District of California

According to Berry, at the end of this interaction, he attributed Landry's behavior to a mental disorder. During his deposition, Berry stated that he could not provide any particular diagnosis; he "just felt that [Landry] was mentally incapable of carrying on for himself safely." In his declaration filed in support of his motion, Berry is more specific. He claims that he "suspected that Mr. Landry was suffering from Alzheimer's or some other form of dementia." Thus, he concluded he had probable cause "to believe Mr. Landry was a danger to himself and to other motorists and pedestrians as a result of a mental disorder."

Berry placed Landry in the back of his patrol car. Landry brought with him a small backpack that contained a partially used oxygen canister. According to Landry, Berry did not let him retrieve his inhaler, which he also uses to treat his COPD, his wheelchair, or any additional oxygen canisters. Berry, however, contends that he took a walker, a suitcase, and two oxygen bottles from Landry's car. Berry impounded the vehicle pursuant to California Vehicle Code section 22651(g), which provides for its removal when the person in charge of it is incapacitated by physical injury or illness.

At approximately 9:00 p.m., Berry contacted the dispatchers to inform them he was holding Landry pursuant to section 5150 and to ask them to call Adult Protective Services (APS). Based on his past experience, Berry believed APS would "take Mr. Landry and care for him until such time that somebody could get [him]." Berry is not sure that he had any understanding as to whether APS would place Landry in a mental hospital, only that the right place for him was "someplace safe."

As a result of budget cuts, APS was no longer available in the evening. Staff at the Humboldt County mental health facility at Sempervirens Hospital answer the phone for APS after hours. Sempervirens instructed the CHP dispatcher to have Landry taken to a hospital emergency room. Accordingly, Berry first drove Landry to Mad River Community Hospital, the closest emergency room to Orick. After speaking with Landry, a nurse told Berry to take him to the mental health hospital.

Berry then drove Landry to Sempervirens, where they arrived around 10:00 p.m. Landry told staff at the hospital that he was there against his will. Berry filed out a section 5150 form and gave it to Brent Jenkins, one of the nurses on duty. In the form, Berry checked boxes indicating that

United States District Court

For the Northern District of California

Landry was both a danger to himself and a danger to others. He did not check the box provided for "gravely disabled adult." On the form, Berry indicated that Landry's condition was brought to his attention under the following circumstances: "Subject crashed his car on U.S. 101 and was called in by several callers because he was driving in the ditch. I found Mr. Landry driving the wrong way on U.S. 101 in Orick, CA. Mr. Landry stated he was going to 'Cemetery, California.'"

While it is disputed how impaired Landry was at the time Berry stopped him, by the time he was taken to Sempervirens, Jenkins testified that he was "acutely ill, had an altered mental status, was confused and disoriented, and was showing very low oxygen levels." As a result of Landry's physical condition, Jenkins was unable to complete a mental health examination. Instead, Jenkins had Landry transported by ambulance to St. Joseph's Hospital. Landry does not remember what happened at this point, he only recalls waking up in the hospital two days later. During that time, Landry was found to be suffering from acute respiratory failure and was admitted to intensive care. Ultimately, he was treated at St. Joseph's and not released for over 90 hours. He was never evaluated or treated for mental illness during that time.

In treatment notes, Jenkins expresses concern that Landry was not taken directly to the hospital "immediately upon contact with the CHP given his obvious signs of distress, his erratic behavior, altered mental status (at times), and repeated encouragement to do so from PES RN." In these notes, Jenkins documents phone conversations he had that evening with people he apparently assumed were CHP officers, but might have been dispatchers. Although he does not identify Berry, Jenkins' narrative indicates that CHP personnel were communicating to him that Landry did not have mental health issues. For instance, Jenkins states that he received the first of three calls from CHP at 9:00 p.m. from a female officer. "The officer took pains to emphasize that the subject did not have any medical issues nor any mental health issues, that they were hoping that APS could possibly find him a motel room to stay in for the night." Jenkins records that he informed the officer that APS could not, after hours, provide that kind of emergency service and that she should take Landry to an emergency room for medical evaluation and, if necessary, social services. About fifteen minutes later, Jenkins received a second call from the same person who again offered that

United States District Court

For the Northern District of California

1    Landry had no medical issues and no mental health issues.  Berry disputes telling the dispatcher or

2    another officer that Landry had no physical issues or mental-health issues.

3           At around 9:52 p.m., Jenkins received a third call from someone he believed to be a male

4    CHP officer.  That person stated that Mad River ER would not take Landry and he was therefore

5    bringing him to mental health.  Jenkins informed the officer that doing so was "not a good or

6    appropriate option" given that he had recommended Landry be taken to a hospital and that "CHP

7    had already communicated to [him], on multiple occasions, that this subject had no mental health

8    issues."  According to Jenkins' record, "[t]he officer stated that he was nonetheless writing a 5150

9    and bringing the subject to [Sempervirens]."  Berry does not recall having that conversation with

10   Jenkins.

11          After his release from St. Joseph's, Landry retrieved his car and continued his drive to

12   Manzanita, Oregon to visit his friend.  He left a few days later and drove the reverse route without

13   incident.  After returning home, he received a bill exceeding $83,000 for medical treatment.

14                                    III.  LEGAL STANDARD

15          Under the Federal Rules of Civil Procedure, a court shall grant summary judgment "if the

16   pleadings, depositions, answers to interrogatories, and admissions on file, together with the

17   affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

18   party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears

19   the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v.*

20   *Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "set forth

21   specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The nonmoving

22   party must identify factual disputes that "might affect the outcome of the suit under governing law."

23   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Irrelevant or unnecessary factual

24   disputes do not raise any genuine issue for trial.  *Id.*  To preclude entry of summary judgment, the

25   nonmoving party must present sufficient evidence such that a jury could return a verdict in his or her

26   favor.  *Id.*

27

28

**United States District Court**
For the Northern District of California

IV.  DISCUSSION

Landry brings one Fourth Amendment claim against Berry for unlawful seizure based on the section 5150 hold.[2]  That statute provides:

> When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer . . . may upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation.

A lawful detention pursuant to section 5150 must comport with Fourth Amendment standards.  *See Harvey v. Alameda County Med. Ctr.*, 280 F. Supp. 2d 960, 969 (N.D. Cal. 2003); *Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1992) (holding seizure of suspected mentally ill person for psychiatric evaluation is "analogous to a criminal arrest and must therefore be supported by probable cause"). In order to have probable cause to detain someone under section 5150, "a state of facts must be known to the peace officer . . . that would lead a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or herself or is gravely disabled."  *People v. Triplett*, 144 Cal. App. 3d 283, 287-288 (1983). An officer's belief or suspicion must be supported by "specific and articulable facts" together with rational inferences.  *Id.* at 228.

A mental disorder, as used in the statute, includes any condition listed in the current edition of the Diagnostic and Statistical Manual of Mental Disorder of the American Psychiatric Association.  As a lay person, an officer need only "articulate behavioral symptoms of mental disorder, either temporary or prolonged."  *Id.*  While it may be difficult to formulate a "lay definition," in general, a mental disorder "might be exhibited if a person's thought processes, as evidenced by words or actions or emotional affect, are bizarre or inappropriate for the circumstances."  *Id.* (concluding that intoxication, tearful condition, and obvious physical signs of recent suicide attempt would lead any reasonably prudent person to believe appellant was a danger to herself as a result of mental disorder).

In this case, Landry has not established that no reasonable jury could find Berry lacked probable cause to believe he was suffering from a mental disorder and would be a danger to himself

---

[2]     Jenkins was initially named as a defendant, but has been voluntarily dismissed with prejudice from the suit.

United States District Court
For the Northern District of California

as a result.  While Landry points out Berry knew few details regarding the earlier 911 calls, the officer was aware, at the time he stopped Landry, that he had previously been taken to a motel by CHP officers and that there had been two prior BOLs issued based on his driving.  Although not the only conclusion, a rationale inference is that Landry's judgment was seriously impaired.  Taking the version of facts offered by Berry, Landry was driving in the wrong direction on the highway and did not initially stop for his marked patrol car with flashing lights.  Berry believed that Landry had recently driven into a guardrail along the highway.  Moreover, Landry appeared to have difficulty understanding and responding to questions.  When Landry stated his destination was "cemetery" or "Cemetery, California," it appeared to Berry that Landry was confused about where he was attempting to go.  Thus, even though Berry interacted with Landry for only three minutes, a reasonable jury could find that probable cause exists to support the section 5150 detention.  Accordingly, Landry's motion for summary judgment must be denied.[3]

At the same time, Berry has not established the existence of probable cause as a matter of law either as to the specific seizure he undertook: commitment of Landry under section 5150.  For a detention to be lawful under the Fourth Amendment, probable cause must be supported by "the facts and circumstances within the knowledge of the arresting officers" at the moment of arrest.  *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005) (internal quotation marks and citation omitted).  At the time Berry decided to subject Landry to a psychiatric hold, he also had determined to impound his car pursuant to California Vehicle Code section 22651(g).  Berry obtained Landry's drivers license and, according to Landry, it was not among his possessions when he was released from the hospital.  Thus, among the circumstances at the time of Landry's detention is the fact that he no longer had access to his car or, most likely, to any other.  To the extent Landry was a danger to himself or others because his driving was impaired, that risk was essentially eliminated when his vehicle was impounded.

---

[3]     Landry brings numerous objections to evidence submitted by Berry in support of his motion for summary judgment in a separate document.  Pursuant to Civil Local Rule 7-3(a), any objections to a motion must be contained within the opposition brief.  In any event, as Landry's motion for summary judgment is denied, the objections are overruled as moot.

United States District Court

For the Northern District of California

1    Nonetheless, in support of the section 5150 hold, Berry emphasizes the danger posed by

2  Landry's erratic driving.  In asserting that he had ample evidence to believe Landry was a danger to

3  himself or others, Berry relies on information from CHP dispatchers and his own observations "that

4  Landry was driving recklessly."  Def. Mot., 18:1-3.  Berry does not suggest that, based on his

5  suspected mental disorder, Landry appeared to be a danger to himself or others independent of his

6  driving.  In short, Berry has not met his burden of demonstrating that no reasonable jury could find

7  the absence of probable cause and his motion for summary judgment must be denied.[4]

8    In the alternative, Berry contends that he is entitled to qualified immunity for the alleged

9  Fourth Amendment violation.  Qualified immunity shields a defendant from a civil suit only if his

10  conduct "did not violate a federal right; or, if it did, the scope of that right was not clearly

11  established at the time."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007) (citation

12  omitted).  Thus, the first question is whether, taking the facts in the light most favorable to the

13  plaintiff, the defendant committed a constitutional violation.  *See id.*  If he did, or if a triable

14  question of fact remains, the next question is whether the right was clearly established.  *See id.*  The

15  contours of the right must be "sufficiently clear that a reasonable official would understand that

16  what he is doing violates [it]."  *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007) (internal

17  quotation marks and citations omitted).

18    Resolving the evidence in Landry's favor leaves a triable issue as to whether Berry subjected

19  Landry to a section 5150 detention without probable cause.  Thus, to be entitled to qualified

20  immunity, Berry must identify some ambiguity in the scope of Landry's Fourth Amendment right

21  under the circumstances such that he could reasonably believe his conduct was lawful.  Berry,

22  however, argues only that he was reasonable in concluding that Landry suffered from a mental

23  disorder that made his driving dangerous: "The facts made known to Officer Berry, plus his own

24  observations, would seem to provide more than sufficient probable cause for a reasonable officer to

25  conclude that Landry presented a danger both to himself and to other motorists or pedestrians, under

26  ───────────────

27  [4]    Landry objects to the declaration of Melvin Selinger, M.D., filed by Berry in support of his
   motion for summary judgment.  As Berry's motion for summary judgment is denied, this objection

28  is also overruled as moot.  To the extent Berry introduces an expert report to bolster the credibility
   of his version of events, it is irrelevant, as the Court does not weigh the evidence in a motion for
   summary judgment.  *See Thomas v. Ponder*, 611 F.3d 1144, 1149 (9th Cir. 2010).

the relatively lenient legal standard [applicable to qualified immunity]." Def. Mot., 22:14-17 (emphasis added). As stated above, Berry must demonstrate more than that. Specifically, he must establish that Landry appeared dangerous to himself or others as a result of a mental disorder even after he was separated from his vehicle. Although Berry argues that qualified immunity allows "ample room" for reasonable mistakes, a reasonable officer knows that probable cause must exist at the moment of seizure. To the extent Berry may have believed that past danger alone was sufficient to commit Landry to an involuntary psychiatric hold, such belief would constitute an unreasonable mistake as to the scope of Landry's right to be free from unreasonable seizure. Accordingly, Berry's motion for summary judgment based on qualified immunity must be denied.

V.  CONCLUSION

For the reasons stated above, the motions for summary judgment by Landry and by Berry are each denied.

IT IS SO ORDERED.

Dated:  9/30/11

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

No. C 10-04707 RS
ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT
11